**SO ORDERED.**
**SIGNED 17th day of October, 2025**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.**
**PLEASE SEE DOCKET FOR ENTRY DATE.**

**Nancy B. King**
**U.S. Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **Case No. 3:25-bk-02702** |
| **BORDEAUX VENTURES, LLC,** | ) | **Chapter 11** |
| | ) | **Judge Nancy B. King** |
| **Debtor.** | ) | |
| | ) | |

---

## MEMORANDUM OPINION

---

This matter is before the Court on Winhall 9, LLC's ("Winhall") Expedited Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d)(3). [Docket No. 71]. This is in essence, a renewed motion based on the Court's prior evidentiary hearing on Winhall's request for stay relief that was denied without prejudice on September 4, 2025. [Docket No. 52]. At that same hearing, the Court invited Winhall to renew the request if the Debtor filed a plan that was patently unconfirmable:

> The Court is going to order that stay relief will be granted on the -- on September 30th if a plan is not filed by September 29th. And the plan that's filed better not have Winhall bearing all the risks of this debtor's very shaky existence trying to hold onto this property. And subordination sounds pretty risky based on today's proof.
>
> Because this is a [Single Asset Real Estate ("SARE")], the debtor's getting this very short reprieve, and the Court was far from convinced that the debtor can reorganize absent Winhall's cooperation, which they clearly do not have. Winhall can renew its motion on an expedited basis after 9/29 if it so desires,

> but right now, this debtor is on life support and is -- and it better come up with something a lot stronger than the vague allegations that it has presented today.

[Transcript of Record at 128, Docket No. 54]. Based on Winhall's request for an expedited hearing, the Court: (1) set this matter for an expedited hearing and (2) as promised at the earlier hearing, independently reviewed the proposed plan filed by the Debtor. Unfortunately, the Debtor's SARE runway has run out, and this Chapter 11 is not taking off. Accordingly, the Court finds that Winhall's Motion for Relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(3) should be GRANTED.[1]

## BACKGROUND

This is the story of a real estate development entangled by financing delays, shifting partnerships, internal member disputes, ambitious but fragile sales contracts, and, ultimately, a bankruptcy precipitated by a contested maturity and default. Each party offers a sharply contrasting narrative: Winhall sees the case as an abusive delay tactic by an

[1] "Modification of the automatic stay ordinarily occurs '[o]n request of a party in interest and after notice and a hearing,' 11 U.S.C. § 362(d)." However, the court may act *sua sponte* when circumstances demand it. *Ramco Inc. v. Charles Guy Evans & Sons Inc.* (*In re Charles Evans Trucking Inc.*), 595 B.R. 715, 728–29 (Bankr. S.D. Miss. 2018) (citation omitted). "The case law establishes that a court may modify the stay *sua sponte* when the circumstances deem it necessary." *Beneficial Nat'l Bank USA v. Best Receptions Sys., Inc.* (*In re Best Reception Sys., Inc.*), 220 B.R. 932, 958 n.43 (Bankr. E.D. Tenn. 1998) (citations omitted); *see also In re McDaniels,* 213 B.R. 197, 201 (Bankr. M.D. Ga.1997); *Miller & Miller Auctioneers, Inc. v. Ritchie Bros. Auctioneers Int'l, L.P.* (*In re Missouri Props., Ltd.*), 211 B.R. 914, 928–29 (Bankr. W.D. Mo.1996) (collecting cases); *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc.* (*In re Elder–Beerman Stores Corp.*), 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996) (collecting cases). In this case, Winhall's motion is a renewal of its request for relief in which an evidentiary hearing was held, and the Court's ruling now is based upon the proof from that hearing and the Plan filed by the Debtor pursuant to 11 U.S.C. § 362(d)(3).

insolvent shell, while Bordeaux Ventures, LLC ("Debtor" or "Bordeaux") asserts it is a good-faith developer trying to reorganize.

Bordeaux is a Tennessee limited liability company formed specifically for the purpose of owning, developing, and selling a large tract of real property at 1501 East Stewarts Lane, Nashville, Tennessee, encompassing four tracts and totaling approximately 188 acres ("the Property"). The Debtor's original members were Homestead Group, LLC, managed by Michael Matthews ("Matthews"), and Trapezoid, LLC, managed by Clint Elliott ("Elliott") and Garrett Bjork ("Bjork"), each owning 50%. The company's origins trace back to a prior entity, Wildflower Partners, LLC ("Wildflower"), which was likewise managed by Matthews, through Dwell Nash, LLC ("Dwell Nash"), and Elliott/Bjork, through Insight Development, LLC.

The story really begins in 2017, when Matthews located the Property and, through Dwell Nash, contracted for its purchase. Litigation with a competing buyer delayed the closing, but after settlement, Wildflower acquired the Property in May 2019 for $2.3 million, funded by a $2.5 million loan from Meridian Capital ("Meridian Loan"). The Property consisted of about 120 acres suitable for residential development and nearly 68 acres of agricultural land. Early development included working with Dewey Engineering and the Metropolitan Government for Davidson County Tennessee Nashville ("Metro"), which in April 2021 approved a "Concept Plan" entitling up to 414 units on the residential portion.

In December 2021, the Meridian Loan was refinanced with BD Capital, resulting in the formation of Bordeaux. The property was simultaneously transferred from Wildflower

to Bordeaux, with the same individuals involved via different entities. The new BD Capital loan had a commitment amount just under $3.66 million, a one-year term, and an interest rate starting at 12% and increasing to 18%. Efforts to market or develop the Property continued. In August 2022, Bordeaux entered into a contract to sell the 120-acre residential portion to Rotunda, an Atlanta-based buyer, for $22.5 million, but the sale ultimately terminated in November 2022 due to Rotunda's unrelated issues.[2]

With the BD Capital loan maturing, Bordeaux refinanced with Commercial Capital BIDCO, Inc. ("Bidco Loan"), in December 2022. The Bidco Loan, secured by the residential development land, had a six-month term and allowed each member entity to receive $680,000 at closing. As the Bidco Loan's maturity approached, Winhall emerged as a potential lender. Bordeaux closed a new loan with Winhall in August 2023 for $6.2 million ("Winhall Loan"). The Winhall Loan paid off the Bidco Loan and included a draw reserve for engineering and lot approvals. It had a 12-month term with monthly payments of $8,500 and an option for Bordeaux to extend for an additional six months. Winhall held the only substantial lien on the Property.

Bordeaux worked to obtain "shovel-ready" lots with Metro's approval. In September 2024, Metro approved the first phase of 29 lots, and plans for two subsequent phases (totaling 98 lots) were advanced. The Debtor's narrative emphasizes these steps as essential to maximizing the Property's value and making it attractive for sale or

[2] Around the same time, Bordeaux sold 11 lots to Dwell Nash for $84,000 per lot as part of an anticipated company wind-down. As noted earlier, Matthews is the majority owner of Dwell Nash.

development. Nonetheless, the Property, described by Winhall as "raw land" with a collapsed barn and mobile home, faced significant development hurdles. Approximately 67 acres were designated as agricultural and ineligible for residential development. No significant revenue has been generated from the Property during Bordeaux's ownership. Both sides agree that Metro's Concept Plan, which was approved and later extended to expire in April 2026, included requirements for street and infrastructure improvements before building permits could be issued.

Bordeaux, and its predecessor Wildflower, have been trying to sell the Property or attract a major investor since at least 2019 or 2020. After the 2022 Rotunda deal fell through during due diligence, Bordeaux entered into a contract with LGI Homes to sell 159 "shovel-ready" lots for nearly $10 million, but the deal was repeatedly extended and ultimately terminated by LGI Homes after Bordeaux's Chapter 11 filing.

By early 2025, Bordeaux faced an impending maturity date on the extended Winhall Loan (February 5, 2025). Winhall demanded full payment and, by March 25, issued a letter giving Bordeaux until April 16 to pay in full. According to Bordeaux, Winhall's required payoff soared; calculations sent in April included principal, substantial interest, late fees, legal fees, and a $2.5 million "equity participation," causing the total demand to spike from the original $6.2 million to more than $10.5 million. Bordeaux questioned the enforceability of Winhall's increasing claims and began exploring legal counsel for usury and other defenses. Unable to secure refinancing or pay off the loan, Bordeaux faced foreclosure, which Winhall scheduled for June 30, 2025. Bordeaux's Chapter 11 petition was ultimately filed minutes before the scheduled foreclosure sale.

Winhall immediately moved to dismiss the bankruptcy or receive relief from the automatic stay, asserting that the Chapter 11 was a last-minute, bad-faith effort to stall foreclosure on a SARE case, with Bordeaux having no real business, employees, or operations and only sporadic unsecured creditors with nominal claims. After an evidentiary hearing, the Court denied the stay relief and motion to dismiss without prejudice to Winhall renewing its requests if the Debtor did not file a plan with a colorable chance of success or did not begin making payments within the 90-day period provided in 11 U.S.C. § 362(d)(3).

The Debtor filed a plan on the ninetieth day. In broad terms, the Debtor's Plan proposes to employ a chief restructuring officer ("CRO") to manage the company and its efforts to either develop the property and complete phased lot sales or, if development financing cannot be obtained, to conduct a sale. If a sale cannot be accomplished, the Debtor proposes to auction the Property. The Plan is described in detail below.

It just so happened that the Plan was filed on the night before a hearing on the Debtor's Motion to Employ Special Counsel, and Winhall's objection thereto. [Docket Nos. 36, 56]. At that hearing on September 30, 2025, Winhall made clear that it planned to renew its stay relief request, and here we are.

## DISCUSSION

### 1. Applicable Standard Under § 362(d)(3)(A)

Motions for relief from the automatic stay are governed by 11 U.S.C. § 362(d), which states, in material part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization; [or]

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90–day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments that –
>
> > (i) may, in the debtor's sole discretion, notwithstanding section 362(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
> >
> > (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

"The party seeking relief bears the burden of establishing 'a *prima facie* showing of cause sufficient to support the party's request,' after which the burden shifts to the debtor to show 'lack of cause to grant relief' from the stay." *In re River Glen Land P'ship*, No. 14-32732, 2015 WL 588696, at *1–2 (Bankr. E.D. Tenn. Feb. 11, 2015) (citation omitted). It is undisputed that the Debtor did not, and could not, commence monthly payments pursuant to 11 U.S.C. § 362(d)(3)(B). Therefore, the only issue is whether the Debtor's Plan filed on the ninetieth day has a "reasonable possibility of being confirmed within a reasonable time" pursuant to 11 U.S.C. § 362(d)(3)(A).

Section 362(d)(3) of the Bankruptcy Code was added by § 218(b) of the Bankruptcy Reform Act of 1994, Pub. L. 103–394, 108 Stat. 4106, 4128 (Oct. 22, 1994), allowing the debtor to defeat a stay relief motion if the debtor has filed a plan that has "a *reasonable possibility* of being confirmed within a reasonable time." 11 U.S.C. §362(d)(3) (emphasis added). As pointed out in many other decisions, the standard "is nearly identical to the standard set forth six years earlier by the United States Supreme Court in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)." *In re Windwood Heights, Inc.*, 385 B.R. 832, 837–38 (Bankr. N.D. W. Va. 2008).[3] What does "reasonable possibility" mean?

[3] In *Timbers*, the Court addressed the stay relief standards under 11 U.S.C. § 362(d)(2), which allows relief if no equity in the property exists, and if the property is "not necessary to an effective reorganization." As the Court stated in *Timbers,* to defeat a stay relief motion by showing that the subject property was "necessary to an effective reorganization," the debtor had to demonstrate that there "must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Timbers,* 484 U.S. at 376 (citation omitted). *See, e.g., In re Deep River Warehouse, Inc.,* No. 04–52749, 2005 WL 1287987, *12–13, (Bankr. M.D. N.C. March 14, 2005) (noting the similarity in the standards of §§ 362(d)(2)(B) and 362(d)(3)(A)).

Courts interpreting this provision are uniformly consistent. The standard is not a mini-confirmation hearing; success need not be guaranteed but must be supported by a reasonable assurance of success; and the proposed or contemplated plan must have a realistic chance of being confirmed. "Inherent in the concept of a reasonable likelihood of rehabilitation for a single asset real estate debtor is '[t]here must be a reasonable possibility of a successful reorganization within a reasonable time.'" *In re Creekside Senior Apartments, L.P.*, 489 B.R. 51, 61–62 (B.A.P. 6th Cir. 2013) (quoting *Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. at 376). *See First Jersey Nat'l Bank v. Brown* (*In re Brown*), 951 F.2d 564, 572 (3d Cir. 1991) (analyzing "a reasonable possibility of a successful reorganization within a reasonable time" as a factor in "cause" under 11 U.S.C. § 1112(b)); *Nationsbank, N.A. v. LDN Corp.* (*In re LDN Corp.*), 191 B.R. 320, 325 (Bankr. E.D. Va. 1996) ("In the context of relief from stay litigation, the analysis of the potential for a successful reorganization is not the same as the standard employed at a confirmation hearing."); *In re Windwood Heights, Inc.*, 385 B.R. at 837–38 (same); *Kane v. Johns–Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 649 (2d Cir. 1988) (stating that success need not be guaranteed—the possibility that a plan may fail is not fatal—but a plan must be supported by adequate evidence that some reasonable assurance of success exists); *In re Nat'l/Northway Ltd. P'ship,* 279 B.R. 17, 24 (Bankr. D. Mass. 2002) (internal citations omitted) ("At a minimum the debtor must show that (1) it is proceeding to propose a plan of reorganization, (2) the proposed or contemplated plan has a realistic chance of being confirmed and (3) the proposed or contemplated plan is not patently unconfirmable."); *In re River Glen Land P'ship,* No. 14-32732, 2015 WL 588696, at *5 (quoting *In re RYYZ,*

*LLC*, 490 B.R. 29, 37 (Bankr. E.D. N.Y. 2013)) ("[T]he debtor's plan will be measured against 11 U.S.C. § 1129's confirmation requirements. However, the debtor's burden is less onerous under Section 362(d)(3)(A) than it is at confirmation; a debtor need not prove that its plan *shall be* confirmed.").

The Bankruptcy Code does not allow a debtor an unlimited amount of time to confirm a plan or an unlimited number of attempts at plan confirmation, particularly in single asset real estate cases. *See* 11 U.S.C. § 362(d)(3). "A debtor in a single asset real estate case that stops making adequate protection payments does so at its own peril and runs the risk that a bankruptcy court will determine that the debtor's plan of reorganization lacks 'a reasonable possibility of being confirmed within a reasonable time.'" *In re Creekside Senior Apartments, L.P.*, 489 B.R. at 61–62 (internal citation omitted).

It is axiomatic that the automatic stay provides debtors with breathing room to "protect assets and marshal their resources to satisfy outstanding obligations." *In re River Glen Land P'ship*, No. 14-32732, 2015 WL 588696, at *1–2 (citing *Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Sur. Co.* (*In re Laguna Assocs. Ltd. P'ship*), 30 F.3d 734, 737 (6th Cir. 1994)). Creditors should not, however, "be deprived of the benefit of their bargain" during the pendency of the automatic stay and may seek relief from the automatic stay. *Id.* (citing *In re Planned Sys., Inc.,* 78 B.R. 852, 860 (Bankr. E.D. Ohio 1987)).

Winhall argues that the Debtor falls within the Bankruptcy Code's definition of single asset real estate and that the Debtor's proposed plan is unconfirmable on its face. While the Debtor's plan does not have to be perfect, the plan should "delineate a credible path to reorganization." *In re River Glen Land P'ship*, 2015 WL at *1-2. For example:

> Hurdles to plan confirmation must be addressed in a way that provides the court with grounds to conclude (i) it is more likely than not they will be overcome, and (ii), because there is a time element, they can be overcome promptly. Unless the plan has a true prospect of being confirmed within a reasonable time, or timely payments have been made, a secured creditor should not be compelled to endure further delay, expense, and risk.

*Id.* (citing *In re RYYZ, LLC*, 490 B.R. at 37). S*ee also In re RIM Dev., LLC*, 448 B.R. 280, 289 (D. Kan. 2010) ("[T]he Court should not expose the debtor to the same level of scrutiny that it will endure if its plan makes it to confirmation, but the Court does require that debtor demonstrate that its plan has 'a realistic chance of being confirmed [and] is not patently unconfirmable.'" (quoting *In re Carlsbad Dev. I, LLC*, No. 08–27768, 2009 WL 588662, at *3 (Bankr. D. Utah Mar. 6, 2009)); *In re Winwood Heights, Inc.*, 385 B.R. at 838 ("[T]he showing required by a debtor under § 362(d)(3)(A) is only that the plan have a reasonable possibility of being confirmed, which is a lesser showing than that required at confirmation."). In other words, if the Debtor's plan is patently unconfirmable, meaning there is not a delineated path to reorganization without Winhall bearing all the risks of the Debtor's desire to reorganize, stay relief should be granted.

**2. The Debtor's Plan**

The Plan provides the following proposed treatment to the Debtor's five classes of creditors:

| | |
|---|---|
| Class 1: Metro Secured Claim for Delinquent Taxes[4] | Paid at applicable interest rate charged on delinquent taxes accruing from the Petition Date at the sale closing relative to each address. |

[4] Metro filed proofs of claim for the following: Claim 3-1 (2024 Property Taxes owed for 1501 E. Stewarts Ln); Claim 4-1 (2024 Property Taxes for East Stewarts Ln); Claim 5-1 (2024 Property Taxes for County Hospital Road); and Claim 6-1 (2024 Property Taxes for East Stewarts Ln). The amount owed in total is $3,191.54 at 18% interest.

| | |
|---|---|
| Class 2: Winhall | The Plan contemplates interest accruing on the full amount stated in the proof of claim at one basis point above the prime rate of interest published by the Wall Street Journal on the first business day of the month in which the Confirmation Order becomes final.<br><br>Winhall's Allowed Secured Claim will be paid in full before the fourth anniversary of the Effective Date. Alternatively, if applicable, Winhall's Allowed Secured Claim will be paid at the Auction Closing (as defined in ______)..[stet] if the amount of Winhall's Allowed Secured Claim is not finally adjudicated before payment thereon would otherwise occur, the payments will be made to the Winhall Escrow Account established under the Plan.<br><br>Winhall shall retain its lien in the Property pursuant to 11 U.S.C. § 506(b) in the same manner and priority as existed prior to the Petition Date, except as otherwise ordered by the Court with respect to the DIP Facility or other party contributing new value to improve the value of the Property collateralizing Winhall's Claim. |
| Class 3: Allowed Priority Unsecured Claims | "Claims meeting the definition of § 507 of the Code that are not otherwise addressed herein, shall be paid in full prior to distribution to Unsecured Claims." |
| Class 4: Allowed General Unsecured Claims | "Allowed Claims in Class 4 will be paid in full within 90 days following the later of (a) funding from the DIP Facility; (b) the first payment of principal on Winhall's Class 2 Claim (whether directly to Winhall or to the Winhall Escrow Account); or (c) if applicable, the closing of the sale of the Property via the Auction Procedures."[5] |
| Class 5: Equity Interests | "Unless otherwise ordered by the Court, the membership interests in the Debtor will remain with the members who held the same as of the Petition Date." |

[5] The Debtor's original Statements and Schedules listed no unsecured creditors. After Winhall filed its original stay relief motion, the Debtor amended the Statements and Schedules to list the following unsecured creditors: IronGate Entrepreneurial Support Systems ($30,000); Jack Stringham/Spencer Fane, LLP (amended amount of claim from $0 to $15,913); and William Dorman ($12,572,14). Based on every pleading filed by the Debtor in this case, there is sufficient equity to pay all unsecured creditors 100% even if Winhall's claim is allowed in the full amount asserted.

The Debtor's means of implementation for payment under the Plan include: "To pay all Allowed Claims in full under the Plan, the Debtor *shall* procure financing sufficient to ensure development funding to complete the Project. Once funding is secured, further development of the infrastructure and lots shall commence." [Plan, Article VI, 6.01, Docket No. 62 (emphasis added)]. A proposed schedule of closings is included in the Plan that provides that Winhall's allowed secured claim will not be paid, but will accrue interest with payment in full before the fourth anniversary of the Effective Date or, in the alternative, the closing of the sale of the Real Property.

The Plan goes on to provide that "[i]mmediately *upon securing* the development funding, an escrow account shall be established for the purpose of depositing funds, over the period of the Plan, that are sufficient to cover the total amount of Winhall's Disputed Claim" *see* Plan, Article VI, Section 6.01 (emphasis added).[6] With continued hope, the Debtor's Plan further states "[i]mmediately after the closing of the [yet to be obtained] DIP Facility, the Debtor will commence development of the Property…." *Id.* [Emphasis added by the Court]. As a backstop, in the event financing is not obtained, the Plan promises that the Debtor will commence marketing the Property for sale in its then-existing condition for 120 days. And finally, as a last resort if the Property is not sold, the Debtor, while at best, is accruing interest only to Winhall, will auction the Property.[7] The Debtor also retains, for itself without seeking any further Court approval, the right to sell the Property post-

---

[6] Article VII, Section 7.04 provides that no distribution will be made on account of a Disputed Claim.

[7] Winhall also points out that in the event or sale or auction, the Debtor's Plan does not provide for Winhall's right to credit bid under 11 U.S.C. § 363(k).

confirmation "at a price sufficient to satisfy all classes of secured claims" but does not include any provision in the event Winhall's allowed secured claim has not yet been determined or for any creditor to object to a sale or sale process.

The Debtor's Plan is essentially the same wishful thinking that the Debtor's principal, Matthews, testified to at the earlier hearing, and is, in many respects, even less concrete.[8] The Court gave the Debtor the benefit of the doubt during the first 90 days of this SARE Chapter 11, but the Plan put forth is full of contingencies for a debtor with no operating capital,[9] no firm commitments for funding or construction, and litigation allegations of usury as its only weapon to stall Winhall further.

**A. Patently Unconfirmable and No Realistic Prospect of Confirmation Within a Reasonable Time.**

The Plan contemplates either securing new development, exit financing[10]—facilitating phased sales of lots, primarily to DRB Group Tennessee, LLC ("DRB Group")—or, if this cannot be achieved within 30 days after plan confirmation, marketing the property for sale and then auction. The DRB Group letter of intent ("LOI") is the centerpiece of Bordeaux's path forward, proposing the sale of approximately 159 lots (44.52 acres), with pricing and takedowns phased across several years. The LOI, however,

---

[8] Matthews testified at the prior stay relief hearing that the Plan would have a "firm commitment letter" from his lender. He testified that he believed the cost per lot for development would be $84,000, but the Disclosure Statement and Plan indicated that the Phase 1 development costs are $103,471.30 per lot.

[9] The Debtor's Monthly Operating Reports have not been timely filed. On October 1, 2025, the Debtor filed a Monthly Operating Report for the period ending July 31, 2025, showing a zero cash balance (with a beginning cash balance of $292.50).

[10] The Debtor refers to the potential financing as DIP Financing, but the Plan promises the financing post-confirmation. There is a statutory difference between DIP financing and exit financing which is discussed by the Court herein.

is explicitly non-binding and contingent during DRB Group's feasibility/due diligence period.

The Plan requires Winhall to accept all the risk for this Debtor who has been unable to develop or sell this land since 2019. The specific provisions of this Plan that make it patently unconfirmable include:

(1) Development Hurdles: Although the Debtor received preliminary approval for 29 lots for Phase 1 and 68 lots for Phase 2 from Metro, the approved plans lapse in April 2026 if the Debtor has not built out Phase 1. In order to build out, the Debtor must complete street and stormwater infrastructure which require the posting of bonds in unknown amounts. The bottom line is that these developments cost money, and this is a Debtor with a negative balance bank account, and a Plan that promises it WILL (not that it has) obtain financing.

(2) Feasibility (DRB Group LOI): The Plan's feasibility is dependent on a non-binding LOI with DRB Group. In fact, the DRB Group LOI states "[t]his LOI does not create a binding contract and will not be enforceable." The DRB Group financing letter is dated September 16, 2025. Matthews promised a "firm commitment" by the time the Plan was filed. That did not materialize.

(3) Feasibility (Sales Contract): The Disclosure Statement and Plan refer to a Sales Contract, but no executed copy of that agreement is provided. However, even if the DRB Group LOI is considered, it is non-binding. The DRB Group LOI provides for a 70-day free look which allows DRB Group to walk away "in its sole discretion" and without further obligation if it is dissatisfied with the deal.

(4) Feasibility (Construction): The Debtor's Disclosure Statement provides that the Debtor "has identified Harakas Construction ("Harakas") as a *likely* contractor to complete the scope of the work needed to develop the lots to a suitable state of closing with the buyer." Like the Debtor's desire to obtain funding, desire to develop, and desire to sell at a maximum profit, this is another last-minute, Hail-Mary pass to stave off foreclosure. There is no commitment here, but even if there were, it is another cost that requires Winhall to bear the risk of financing as the Debtor would have it, with a subordinated lien.

(5) Exit Financing:[11] The Debtor's Plan promises a motion to approve DIP financing in the maximum amount of $6.3 million[12] with the all-in investment in the Property of $19.3 million (Equity: $2 million, Existing Debt: $11 million, DIP Debt: $6.3 million). Presumably, the Debtor seeks to prime Winhall. Matthews testified at the prior hearing that this loan, if obtained, would prime Winhall. The Court cannot approve a priming loan to an exit financing lender when the loan's purpose is to fund post-confirmation operations instead of funding the administration of the estate.[13]

(6) The Debtor's Monthly Operating Reports (not current), show a negative cash balance. Matthews is himself in a chapter 11 case. He also has several related entities that have filed. The overall picture is one of a house of cards and the wind is blowing. Despite the lack of cash, the Debtor seeks to hire special counsel to pursue claims litigation against Winhall, employ a CRO, and have funds to develop the "shovel ready" land in a timely manner.

(7) Speculative Future: The Plan proposes to keep Winhall on the hook for all eventualities that the Debtor has been unable to accomplish prior to bankruptcy, first through a development phase (with the hope of financing), secondly through a sale process, and then finally through an auction process all without payment to Winhall. Winhall's payment is promised to be before the fourth anniversary of the Effective Date. During those four years, it is possible Winhall will not receive any payment. The Plan provides that Winhall will retain its lien on "the Property" to the same extent and in the same priority during the Plan. It does not provide that Winhall retains its lien on the real estate proceeds or that sales proceeds would be held in escrow for Winhall.

(8) Auction without Payment: If the Debtor is unable to obtain financing, or in the Debtor's parlance, if the funding "does not manifest," the Debtor proposes that it receive an additional eight months to sell or auction the Property. During that period, Winhall would receive no payments. How could Winhall be paid during that time since the Debtor has no cash? The auction option provides no right to credit bid, no sale or auction procedures, and no opportunity to object to a proposed sale. In other

---

[11] The Debtor refers to the potential financing as a DIP loan, but it would not be closed and funded prior to confirmation, making it by definition "exit financing." The Debtor's Disclosure Statement and Plan provide that the Funding Deadline is thirty days following the Effective Date. The Effective Date is "the first day of the first full month following entry of an order confirming the Plan." [Plan, Article II, Paragraph P].

[12] The Debtor's Plan also contemplates use of the $2,621,200 Deposit that would be put up by DRB Group to fund development costs, but the DRB Group LOI contemplates release of the deposit "when the developer has received an LDP." Presumably, an LDP would not be issued without the posting of a bond.

[13] The Court discusses this point further below.

words, the Debtor will have the benefit of a stay for an additional eight months without paying Winhall. Again, Winhall bears all the financial risks.

(9) Credibility Issues: At the prior hearing, Matthews was not a credible witness and provided evasive or unconvincing testimony.[14] Even if a CRO was approved, Matthews' potential influence on the Debtor's reorganization is less than comforting. The Disclosure Statement provides: "While Mr. Matthews would remain involved in facilitating and implementing the Plan, the CRO, in consultation with the Debtor and its legal and professional advisors, would have sole and exclusive decision-making authority…." [Disclosure Statement at 9, Docket No. 61]. This Property was purchased for $2.3 million in 2019, and has now been refinanced three times (BD Capital, Bidco, and Winhall) with the debt increasing from 2.5 million to 6.2 million by the time Winhall entered the picture. Matthews, as the Debtor's manager, has been unsuccessful in moving past dirt lots. Nothing in the Debtor's Plan marks a delineated path showing that reorganization is more likely than not.

The Plan proposed by the Debtor seems more likely than not to be followed by the need for further reorganization or liquidation and thus cannot comply with 11 U.S.C. § 1129(a)(11). *See In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 699 (Bankr. D. Kan. 1992) (citations omitted) ("[W]ithout proper funding in place or a firm commitment of such funding, the Court cannot find the plan feasible."); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006) (citation omitted) ("'The Debtor must offer more than speculation about the source of funding for the plan.'"); *In re Made in Detroit, Inc.*, 299 B.R. 170, 176-77 (Bankr. E.D. Mich. 2003) (rejecting a plan contingent on exit financing that was not reasonably likely to close).

Although the Debtor clearly wishes for this project to succeed, for the reasons already stated above, the proposed plan is both unconfirmable and has no realistic chance

[14] *Barrett v. Educ. Credit Mgmt. Corp.* (*In re Barrett*), 487 F.3d 353, 362 (6th Cir. 2007) (The bankruptcy court, as the trier of fact, is competent to assess and credit witnesses' testimony.).

of being confirmed within a reasonable time—particularly because this is a single asset real estate case. *See In re Carlsbad Dev. I, LLC*, 2009 WL 588662, at *3. The Court cautioned the Debtor at the prior stay relief hearing that it would not be tolerant of a plan that relies solely on subordinating Winhall's lien, but that is exactly what the Debtor's Plan does. It simply places too much risk on Winhall when the Debtor has been grossly unsuccessful in developing the Property in the past. *See In re Scrubs Car Wash, Inc.*, 527 B.R. 453, 459 (Bankr. D. Colo. 2015) (finding that subordination of secured creditor's existing lien as a means of implementation was not fair and equitable); *Ford Prods. Corp. v. Bank of New York* (*In re Fords Prods. Corp.*), 159 B.R. 693, 695 (Bankr. S.D. N.Y. 1993) (noting that if a lien is subordinated the creditor does not retain its lien as required by 11 U.S.C. § 1129(b)(2)(A)(i)(I)).

Although called DIP financing in the Debtor's Plan, what is really being pursued is exit financing because: (1) even if a commitment is signed, it would not be funded until post-confirmation; (2) the outside "Funding Date" in the Plan is by definition, post-confirmation; and most importantly, (3) the loan is not to fund the reorganization; it is to fund operations post-confirmation.

The distinction between DIP financing and exit financing is an important one. Section 364(d)(1) may not be used as exit financing because estate property vests in the reorganized debtor upon confirmation, and Section 364(d)(1) applies only to trustees and debtors in possession. *See GPIF Aspen Club LLC v. Aspen Club & Spa, LLC* (*In re Aspen Club & Spa, LLC*), No. CO-19-043, 2020 WL 4251761, at *9-10 (B.A.P. 10th Cir. July 24, 2020). The language of 11 U.S.C. § 364 provides in relevant part:

> (d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on *property of the estate* that is subject to a lien only if—
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1) (emphasis added). A debtor in possession or trustee may only obtain financing that is secured by *property of the estate*. Upon confirmation, Section 364(d)(1) ceases to be applicable because the debtor in possession becomes the reorganized debtor. The Tenth Circuit Bankruptcy Appellate Panel also noted that this is true even if the liens were recorded prior to confirmation but funding occurred post-confirmation. *Id.* at *10-11. First, the Court pointed out that Section 364 is a debtor in possession or trustee tool to fund the costs of administering a bankruptcy case and is not meant for post-confirmation operations. *Id.* Secondly, the Court noted that 11 U.S.C. § 364(a) allows an administrative expense priority for actual DIP lending. Section 503(b)(1) expenses are to be paid on a Plan's effective date—an impossibility for exit financing, and furthermore, administrative expenses are for the costs of preserving the estate, not the funding of post-confirmation operations. *Id.* at *11.

Of particular interest in the *Aspen* decision was the Court's secondary holding that the bankruptcy court abused its discretion in denying the creditor's request for stay relief that was raised in response to the Debtor's financing motion. *Id.* at *7. The Court found that the debtor's longshot exit financing motion that sought, just like in this case, to prime the secured lender was impermissible and remanded the matter to the Bankruptcy Court to

determine whether stay relief should have been granted under the SARE stay relief standard. *Id*. at 14.

The Debtor in this case has put forth a Plan that relies on the same visionary scheme, only it is even more speculative because no financing motion was filed with the Plan, merely optimism. The funds that the Debtor hopes will "manifest" are to fund post-petition operations, not to fund the reorganization. The Debtor's best effort relies upon an unworkable, and under the clear language of the Code, impermissible funding source. Overall, the Debtor's Plan proves too little too late in this SARE context.

**CONCLUSION**

The Debtor's Plan fails to present as more than a desire to hang on to the equity in this Property by any means necessary. Unfortunately, it does not "delineate a credible path to reorganization." *In re River Glen Land P'ship*, 2015 WL 588696, at *1–2. For all the reasons cited herein, the Plan: (1) is not feasible under 11 U.S.C. § 1129(a)(3); (2) is not "fair and equitable" as to Winhall under 11 U.S.C. § 1129(b)(2)(A); and (3) is more likely than not to be followed by the need for liquidation or further reorganization under 11 U.S.C. § 1129(a)(11). The Court finds that the Plan is patently unconfirmable and does not present a realistic prospect of confirmation within a reasonable time.

Accordingly, the Court finds that Winhall's Motion for Relief from the automatic stay pursuant to 11 U.S.C. § 363(d)(3) should be GRANTED.

An appropriate Order will be entered.

**THIS MEMORANDUM OPINION WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**